UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | |
|---|---|
| MICHAEL McKEE, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | No. 4:12 CV 509 DDN |
| ) | |
| CAROLYN W. COLVIN, ) | |
| Acting Commissioner of Social Security, ) | |
| ) | |
| Defendant. ) | |

**MEMORANDUM**

This action is before the court for judicial review of the final decision of the defendant Acting Commissioner of Social Security denying the application of plaintiff Michael McKee for disability insurance benefits under Title II of the Social Security Act, 42 U.S.C. § 401, et seq., and for supplemental security income under Title XVI of that Act, 42 U.S.C. § 1381, et seq. The parties have consented to the exercise of plenary authority by the undersigned United States Magistrate Judge pursuant to 28 U.S.C. § 636(c). (Doc. 8.) For the reasons set forth below, the decision of the Administrative Law Judge is affirmed.

**I.  BACKGROUND**

Plaintiff Michael McKee, who was born on February 1, 1963, filed an application for Title II and Title XVI benefits on July 24, 2008. (Tr. 193-204.) He alleged an onset date of disability of July 15, 1997, due to cellulitis in both legs. (Tr. 153-54, 191-98.) Plaintiff's applications were denied initially on September 22, 2008, and he requested a hearing before an ALJ. (Tr. 64-73, 76-80.)

On October 26, 2010, following a hearing, the ALJ found plaintiff was not disabled. (Tr. 10-20.) On February 18, 2012 the Appeals Council denied plaintiff's request for review. (Tr. 1-3.) Thus, the decision of the ALJ stands as the final decision of the Commissioner.

## II.  MEDICAL HISTORY

On August 23, 1997, plaintiff went to the emergency room and was admitted.  He complained of fever, night sweats, and right ankle pain and swelling that spread to his calf.  Plaintiff described the pain as burning, and he could not put weight on his leg.  He reported that he hit his leg on a "big metal valve" at work during the previous night.  He presented with lymphangitis,[1] which receded during his admission, and limited range of motion in his right ankle due to contracture of the Achilles tendon.[2]  On August 26, 1997, he developed a rash on his face.  He was diagnosed with herpes simplex infection and treated with Acyclovir.[3]  Plaintiff underwent an MRI scan on his right leg, which John Morley, M.D., found consistent with cellulitis.[4]  Dr. Morley ruled out deep venous thrombosis.[5]  On September 4, 1997, plaintiff was discharged to a nursing home to complete his antibiotic treatment.  Upon discharge, Dr. Morley noted extreme improvement in the erythema, temperature, and edema of plaintiff's right leg.[6]  Plaintiff's discharge medications included Tramadol, Motrin, Lotrimin, Bactrim, and Nafcillin.[7]  (Tr. 291-92, 295, 303-305.)

On February 11, 1998, plaintiff was admitted to the hospital and complained of swelling, edema, redness, and tenderness in his right leg.  He also complained of fever, nausea, and chills.

---

[1] Lymphangitis is the inflammation of the lymphatic vessels.  Stedman's Medical Dictionary, 1127 (28th ed., Lippincott Williams & Wilkins 2006) (Stedman).

[2] Contracture is static muscle shortening.  Stedman at 436.

[3] Acyclovir is used to treat infections caused by certain types of viruses.  WebMD, http://www.webmd.com/drugs (last visited on March 18, 2013).

[4] Cellulitis is the inflammation of subcutaneous, loose connective tissue.  Stedman at 343.

[5] Deep venous thrombosis is a clot formed from the constituents of blood in the deep veins, usually of the lower extremity or pelvis.  The condition carries a high risk of pulmonary embolism.  Stedman at 1985.

[6] Edema is the accumulation of an excessive amount of watery fluid in cells or intracellular tissues.  Stedman at 612.  Erythema is redness due to capillary dilation.  Id. at 666.

[7] Tramadol is used to relieve moderate to moderately severe pain.  WebMD, http://www.webmd.com/drugs (last visited on March 18, 2013).  Motrin is used to relieve pain.  Id. Lotrimin is used to treat skin infections.  Id.  Bactrim is an antibiotic.  Id.  Nafcillin is used to treat bacterial infection.  Id.

Horace Perry, M.D., diagnosed plaintiff with acute cellulitis superimposed on chronic cellulitis. Dr. Perry found that streptococci caused plaintiff's acute cellulitis and treated him with Penicillin. Dr. Perry biopsied plaintiff's skin and confirmed his diagnosis. On February 16, 1998, plaintiff was discharged. Plaintiff's discharge medications included Nizoral, Penicillin, and Motrin.[8] (Tr. 277-79.)

On October 19, 2002, plaintiff went to the emergency room and was admitted. He complained that the cellulitis began to spread to his groin. He also complained of fever, lightheadedness, and nausea. Jacob Sosna, M.D., observed edema, erythema, and tenderness in both of plaintiff's legs. Plaintiff told Dr. Sosna that he had streptococcus in his bloodstream and that he periodically needed antibiotic therapy, including the use of Augmentin and Clindamycin.[9] He reported that he had not taken Clindamycin for two months due to insufficient funds. He also reported that hitting his right foot on a vat of yeast at work caused the cellulitis and that he had been admitted to hospitals six times due to his condition. Dr. Sosna predicted that the recurring nature of plaintiff cellulitis would continue due to the weakness of his immune system. Plaintiff was discharged the following day. (Tr. 328-30.)

On June 30, 2005, plaintiff went to the emergency room and complained of abdominal pain. Plaintiff reported that he lived with a friend. Kimberly Lederman, M.D., noted that plaintiff's medications consisted solely of Emetrol, an over-the-counter medication used to prevent nausea and vomiting. Dr. Lederman's impression was gastroenteritis.[10] (Tr. 343-62.)

On January 1, 2006, plaintiff went to the emergency room and complained of knee and back pain due to a skateboarding accident. Plaintiff reported that he lived alone. Jonathan Hayes, M.D., noted that plaintiff's X-rays were unremarkable, and his impression was low back contusion and left knee contusion. (Tr. 353-60.)

---

[8] Nizoral is used to treat skin infection. WebMD, http://www.webmd.com/drugs (last visited on March 18, 2013). Penicillin is used to treat and prevent a wide variety of bacterial infections. Id.

[9] Augmentin is a penicillin-type antibiotic used to treat a wide variety of bacterial infections. WebMD, http://www.webmd.com/drugs (last visited on March 18, 2013). Clindamycin is also used to treat a wide variety of bacterial infections. Id.

[10] Gastroenteritis is the inflammation of the mucous membrane of both stomach and intestine. Stedman at 791.

On July 23, 2006, plaintiff went to the emergency room and was admitted. He complained of redness, pain, and swelling in his lower right leg as well as fever, chills, and muscle weakness. He also complained of streaks on his right thigh and pain in his right groin lymph nodes. Plaintiff informed Scott Soerries, M.D., that he lived alone and that he took no medication regularly. During his hospital stay, plaintiff suffered from thrombocytopenia,[11] but tested negative for deep venous thrombosis. Adela Kola, M.D., diagnosed recurrent cellulitis and diabetes. On July 29, 2006, Dr. Kola discharged plaintiff with instructions to refrain from significant physical activity to allow his leg to heal. Plaintiff's discharge medications included Metformin, Zocor, Lisinopril, Augmentin, Vicodin, and Eucerin.[12] (Tr. 414-18, 431-33.)

On August 14, 2006, plaintiff went to the emergency room and was admitted. Although he maintained that he complied with instructions regarding leg elevation and antibiotic medication, plaintiff complained of swelling, blistering, redness, and tenderness in his lower right leg that began two days earlier. Dr. Kola treated plaintiff with antibiotics. On August 17, 2006, plaintiff was discharged. (Tr. 388-96.)

On March 21, 2008, plaintiff went to the emergency room after falling and complained of pain in the stomach and groin. The records indicate that plaintiff took no medication. Plaintiff was diagnosed with a torn groin and hematoma. (Tr. 378-85.)

On December 10, 2009, William Burmeister, M.D., submitted a Physical Residual Functional Capacity Questionnaire. He reported only occasional visits from plaintiff and diagnosed plaintiff with recurrent erysipelas in the legs.[13] He stated that plaintiff's symptoms included swelling, erythema, fever, and chills and that plaintiff suffered pain during activity. He also stated that he treated plaintiff by suppressing the infection but that plaintiff failed to comply regularly due to

---

[11] Thrombocytopenia is a condition in which an abnormally small number of platelets is present in the circulating blood. Stedman at 1984.

[12] Metformin is used with a proper diet and exercise program and possibly with other medications to control high blood sugar. WebMD, http://www.webmd.com/drugs (last visited on March 18, 2013). Zocor is used with a proper diet to lower bad cholesterol and fats and raise good cholesterol in the blood. Id. Lisinopril is used to treat high blood pressure. Id. Eucerin is a moisturizer to treat or prevent dry, rough, scaly, itchy skin and minor skin irritations. Id.

[13] Erysipelas is a specific, acute, superficial cutaneous cellulitis caused by streptococci and characterized by hot, red, edematous, brawny, and sharply defined eruptions. Stedman at 666.

inability to pay. Dr. Burmeister opined that plaintiff's symptoms would interfere with attention and concentration occasionally. However, he expressly declined to answer other questions regarding the effect of plaintiff's condition on his ability to work. (Tr. 441-44.)

On February 22, 2010, Sarwath Bhattacharya, M.D., performed an internal medicine examination on plaintiff. Dr. Bhattacharya noted that plaintiff was single and lived with his mother and that he last worked for Anheuser-Busch ten years earlier in quality control. Plaintiff had cellulitis in both legs. Every seven to ten days, he experienced a flare-up, and his legs became swollen, painful, red and tender. Plaintiff stated that he could not walk during flare-ups, and that the condition required him to elevate his legs for two to three days. He reported that he could not do anything except use the bathroom during flare-ups. He had taken Augmentin twice per day for eight to ten days following the onset of the flare-ups. Dr. Bhattacharya observed swelling and edema on plaintiff's feet and ankles and noted that the swelling decreased the range of motion of both ankles. She also observed redness, inflammation, and extreme tenderness in his legs. Dr. Bhattacharya's impression was cellulitis beneath the knees in both legs with frequent flare-ups that required antibiotics and leg elevation. (Tr. 445-48.)

Dr. Bhattacharya also submitted a Medical Source Statement of Ability To Do Work-Related Activities (Physical) form. She found that plaintiff could occasionally lift and carry eleven to twenty pounds. She determined that plaintiff could sit for eight hours during an eight-hour work day but could stand only for an hour and walk only for thirty minutes. She indicated that plaintiff could occasionally climb stairs and ramps but could not operate foot controls with either foot, climb ladders or scaffolds, balance, stoop, kneel, crouch, or crawl. She also found that plaintiff should avoid exposure to unprotected heights and vibrations. (Tr. 449-54.)

**Testimony at the Hearing**

A hearing was conducted before an ALJ on December 16, 2009. (Tr. 35-61.) Plaintiff testified to the following. He never married and has no children. He attended one year of college. He measures six feet, four inches and 210 pounds. After the onset of his cellulitis, he moved into his parents' ranch house. His father had died recently. Before moving into his parents' home, he shared an apartment. (Tr. 39-42.)

He last worked in 1997. He has no income. He filed a workers' compensation claim for his cellulitis and received a settlement. From 2004 to 2008, he made between $1000 and $6000 per year selling his furniture at garage sales and flea markets. He stores his possessions at his mother's house and at his friend's house. His sister and brother-in-law assist plaintiff with the garage sales by moving and lifting furniture. During the garage sales, plaintiff sits at a table, prices the furniture, and receives payment. He also goes to flea markets once every two or three months and sells items, including clothes, small furniture, and toys. (Tr. 42-46, 57-58.)

Plaintiff worked as a laboratory technician at a brewery. From 2001 to 2008, plaintiff worked as an errand runner and created a business named Michael Enterprises. He made up to $100 per week and worked up to six hours per day two days per week. Specifically, he watched his sister's and neighbor's pets and made trips to stores. By 2008, he only worked once every two weeks. He quit because operating pedals while driving can aggravate his cellulitis condition. He received payments from General American Life Insurance Company in 1994, 1995, and 1997. Plaintiff explained that he received one payment as a workers' compensation settlement due to chemicals in his eye but could not explain the other payments. (Tr. 46-50.)

In 1997, he was diagnosed with cellulitis. Due to cellulitis, he has made several trips to hospitals, including emergency room visits, and spent several weeks in a life care facility. He has received antibiotic treatment for his condition. In 2009, he did not go to the hospital for cellulitis treatment. In 2008, he went to the hospital twice due to his cellulitis, including an emergency room visit at Des Peres Hospital. In 2007, cellulitis caused him to go the hospital, but plaintiff could not remember the number or the dates of hospital visits. His condition has not required him to visit the hospital every year. No other condition impacts his ability to work. He has limited contact with Dr. Burmeister, his current physician, due to his inability to pay. (Tr. 50-51, 60.)

When he can afford to pay, he takes Augmentin and Clindamycin during flare-ups, which occur once or twice a week. During flare-ups, his lower legs swell to the size of footballs and turn dark black and blue. The condition is more severe in his right leg but has spread to his left leg. His legs throb and hurt, and he runs a fever. Sometimes the antibiotics are ineffective, and sometimes they cause nausea and dizziness. He lies in his bed and elevates his legs to relieve pain and swelling. The flare-ups last two or three days. Hitting his legs or lifting more than two pounds trigger the flare-ups. During garage sales, he only lifts light items such as books or small toys. (Tr. 52, 58-59.)

He does not smoke, drink alcohol, or use illegal drugs. He drove to the ALJ hearing. When he can, he assists his mother with household chores, including dishwashing, laundry, vacuuming, and yard work. He does not have any hobbies and does not attend sporting events. Plaintiff has a bullet fragment in his left hip as a result of old hunting injury. He enjoyed hunting rabbits, squirrels, ducks, and deer, but he stopped after the onset of cellulitis. The last time he had a hunting license was 1996. He can use a computer with limited proficiency. He has friends that call and visit him. He attends family functions when he can. His mother shops for his groceries and clothes. His neighbor or brother-in-law helps his mother carry groceries because he cannot carry heavier items. He has very little need for new clothes because he rarely goes anywhere. (Tr. 52-55.)

During a typical day, he gets out of bed, eats breakfast, and reads the newspaper. Sometimes he makes his own breakfast. He also watches the news and converses with his mother. He goes places with his mother, sister, or brother-in-law if his legs are not swollen. He occasionally attends church his mother. (Tr. 56.)

On good days, he can walk for a half hour, but on bad days he does not try to walk because of the pain. His bad days occur every week, and their frequency has increased over the years. Because standing triggers his condition, he usually sits. He feels the effects of his condition if he stands for longer than twenty minutes. After standing, he sits and elevates his legs. He can sit between five and thirty minutes. The ALJ mentioned that plaintiff had been sitting for a longer period during the hearing, and plaintiff responded that he already felt "tingling in his legs." He also wears therapeutic socks. (Tr. 56-57.)

The ALJ requested a consultative examination because of plaintiff's limited medical record. (Tr. 60.) On August 4, 2010, the ALJ held a supplemental hearing to receive testimony from Vocational Expert (VE) Dolores Gonzalez. (Tr. 24-34.) Plaintiff testified that he worked intermittently as an errand runner for less than a year. (Tr. 30.)

The ALJ asked the VE to identify plaintiff's vocational history during the past fifteen years. The VE replied that plaintiff worked as a life guard, which is medium, semi-skilled work; laboratory technician, which is heavy, semi-skilled work; courier or peddler, which is light, unskilled work; and personal shopper, which is light, semi-skilled work. (Tr. 30.)

The ALJ presented a hypothetical question to the VE concerning a person of plaintiff's education, training, and work experience who is capable of light work but limited to occasionally

- 7 -

climbing stairs and ramps; never climbing ropes, ladders, or scaffolds; and occasional stooping, kneeling, crouching, and crawling. The individual must also avoid concentrated exposure to extreme temperatures and vibrations. The VE replied that the individual could work as a personal shopper, which has 140,680 positions nationally, 4,000 in Missouri, and 940 in the St. Louis area, and as a cashier, which has 3,479,390 positions nationally, 81,800 in Missouri, and 34,850 in the area. (Tr. 31.)

The ALJ altered the hypothetical individual by requiring a sit/stand option for the individual and restricting the individual from moderate exposure to extreme temperatures and vibrations. The VE responded that the individual could continue to work as a cashier but only in about twenty-five percent of the positions. The VE also stated that the individual could work as an order caller, which has 2,906,600 positions nationally, 77,940 in Missouri, and 35,230 in the area. (Tr. 31-32.)

The ALJ further altered the hypothetical individual by restricting the individual from kneeling and crouching. The VE replied that the alteration did not affect the jobs that the individual could perform. Then, the ALJ altered the hypothetical individual by requiring the opportunity for leg elevation three times per work day for a total of ten minutes, which could take place during breaks. The VE again replied that the alteration did not affect the jobs that the individual could perform. The ALJ altered the hypothetical individual by requiring the opportunity for leg elevation three times per work day for periods of thirty minutes. The VE responded that the hypothetical individual could perform no jobs. (Tr. 32-33.)

### III. DECISION OF THE ALJ

On October 26, 2010, the ALJ issued a decision that plaintiff was not disabled. (Tr. 10-20.) At Step One of the prescribed regulatory decision-making scheme,[14] the ALJ found that plaintiff had not engaged in substantial gainful activity since July 15, 1997. At Step Two, the ALF found that plaintiff suffered from the severe impairment of cellulitis. (Tr. 12-13.)

At Step Three, the ALJ found that plaintiff had no impairment or combination of impairments that met or was the medical equivalent of an impairment in the Commissioner's list of presumptively disabling impairments. (Tr. 13-14.)

---

[14] See below for explanation.

The ALJ considered the record and determined that plaintiff had the residual functional capacity (RFC) to perform light work, except he requires a sit/stand option with the ability to change positions frequently; can never climb ropes, ladders, or scaffolds; can occasionally climb stairs and ramps, stoop, crouch, and kneel; and must avoid moderate exposure to vibration and extreme cold and heat. At Step Four, the ALJ determined that plaintiff was unable to perform past relevant work. (Tr. 14-19.)

At Step Five, the ALJ considered plaintiff's age, education, work experience, and residual functional capacity and determined that plaintiff could perform jobs existing in significant numbers in the national economy. The ALJ concluded that plaintiff was not disabled. (Tr. 19-20.)

## IV.  GENERAL LEGAL PRINCIPLES

The court's role on judicial review of the Commissioner's decision is to determine whether the Commissioner's findings comply with the relevant legal requirements and are supported by substantial evidence in the record as a whole. Pate-Fires v. Astrue, 564 F.3d 935, 942 (8th Cir. 2009). "Substantial evidence is less than a preponderance, but is enough that a reasonable mind would find it adequate to support the Commissioner's conclusion." Id. In determining whether the evidence is substantial, the court considers evidence that both supports and detracts from the Commissioner's decision. Id. As long as substantial evidence supports the decision, the court may not reverse it merely because substantial evidence exists in the record that would support a contrary outcome or because the court would have decided the case differently. See Krogmeier v. Barnhart, 294 F.3d 1019, 1022 (8th Cir. 2002).

To be entitled to disability benefits, a claimant must prove he is unable to perform any substantial gainful activity due to a medically determinable physical or mental impairment that would either result in death or which has lasted or could be expected to last for at least twelve continuous months. 42 U.S.C. §§ 423(a)(1)(D), (d)(1)(A), 1382c(a)(3)(A); Pate-Fires, 564 F.3d at 942 (8th Cir. 2009). A five-step regulatory framework is used to determine whether an individual is disabled. 20 C.F.R. §§ 404.1520(a)(4); see also Bowen v. Yuckert, 482 U.S. 137, 140-42 (1987) (describing the five-step process); Pate-Fires, 564 F.3d at 942 (same).

Steps One through Three require the claimant to prove (1) he is not currently engaged in substantial gainful activity, (2) he suffers from a severe impairment, and (3) his disability meets or

equals a listed impairment. 20 C.F.R. §§ 404.1520(a)(4)(i)-(iii). If the claimant does not suffer from a listed impairment or its equivalent, the Commissioner's analysis proceeds to Steps Four and Five. Step Four requires the Commissioner to consider whether the claimant retains the RFC to perform his past relevant work (PRW). Id. § 404.1520(a)(4)(iv). The claimant bears the burden of demonstrating he is no longer able to return to her PRW. Pate-Fires, 564 F.3d at 942. If the Commissioner determines the claimant cannot return to PRW, the burden shifts to the Commissioner at Step Five to show the claimant retains the RFC to perform other work that exists in significant numbers in the national economy. Id.; 20 C.F.R. § 404.1520(a)(4)(v).

## V.  DISCUSSION

Plaintiff argues the ALJ erred in (1) determining plaintiff's RFC; and (2) relying on the VE's response to a hypothetical question that failed to capture the concrete consequences of plaintiff's impairments.

### A.  RFC Determination

Plaintiff argues that substantial evidence does not support the RFC determination. Residual functional capacity is the ability of a claimant to do the requisite physical acts day in and day out, in the sometimes competitive and stressful conditions in which real people work in the real world. Wilcutts v. Apfel, 143 F.3d 1134, 1137 (8th Cir. 1998). Residual functional capacity is a medical determination. Singh v. Apfel, 222 F.3d 448, 451 (8th Cir. 2000). Some medical evidence must support the RFC determination. Lauer v. Apfel, 245 F.3d 700, 704 (8th Cir. 2001).

Plaintiff argues that the ALJ improperly discounted plaintiff's subjective complaints. "An ALJ may discount a claimant's subjective complaints if there are inconsistencies in the record as a whole." Van Vickle v. Astrue, 539 F.3d 825, 828 (8th Cir. 2008). Failure to seek ongoing medical treatment is another factor an ALJ may consider. Halverson v. Astrue, 600 F.3d 922, 932 (8th Cir. 2010). However, inability to pay can justify a claimant's failure to seek medical treatment. Vasey v. Astrue, 2009 WL 4730688 at *5 (E.D. Ark. 2009). Work performed during the alleged onset period can also be relevant to discredit a claimant's allegations. 20 C.F.R. § 416.971; Weber v. Barnhart, 348 F.3d 723, 725 (8th Cir. 2003); Naber v. Shalala, 22 F.3d 186, 188-89 (8th Cir. 1994).

Here, the ALJ relies on the intermittent nature of plaintiff's treatment to discredit plaintiff's

allegations. From 1998 to 2006 and from 2002 to 2006, the record indicates that plaintiff only once sought treatment for cellulitis. (Tr. 327-42.) Plaintiff argues that his failure to seek treatment resulted from his inability to pay. However, during these time periods, plaintiff sought treatment after a skateboard accident and for abdominal pain. (Tr. 343-76.) Plaintiff's testimony is also inconsistent with his statements in the record. Although he testified at the hearing that he lived with his parents since 1997, plaintiff told Dr. Hayes and Dr. Soerries that he lived alone and told Dr. Lederman that he lived with a friend. (Tr. 41-42, 359, 417.) He also testified that he worked as an errand runner from 2001 to 2008, but later testified that he worked as an errand runner for only a year. (Tr. 29-30, 46-48.) Plaintiff also performed several activities inconsistent with the alleged impairment, including skateboarding, living alone, and working part-time. (Tr. 43-49, 359, 363, 417.)

Plaintiff also argues that the ALJ improperly discounted Dr. Bhattacharya's report. In his decision, the ALJ inferred that Dr. Bhattacharya relied primarily on plaintiff's statements because her finding that cellulitis had spread to the bone found no support in the medical record and because she found plaintiff more limited than otherwise indicated by the record. (Tr. 17-18.) Plaintiff argues that by inferring that plaintiff made statements to the doctor and that the doctor relied on plaintiff's statements, the ALJ engaged in improper medical conjecture.

"An administrative law judge may not draw upon his own inferences from medical reports." Shontos v. Barnhart, 328 F.3d 418, 426 (8th Cir. 2003); Lund v. Weinberger, 520 F.2d 782, 785 (8th Cir. 1975). However, an ALJ may discount a physician's opinion that is based on discredited subjective complaints. Craig v. Apfel, 212 F.3d 433, 436 (8th Cir. 2000).

Although the report does not explicitly state that Dr. Bhattacharya interviewed plaintiff, she refers to plaintiff's status during the date of the examination and attributes several statements to him. (Tr. 445.) Although an ALJ may not make medical inferences from the record, plaintiff points to no authority prohibiting the use of such common sense inferences. The ALJ's finding that Dr. Bhattacharya relied primarily on plaintiff's statements is also not a medical inference. Dr. Bhattacharya, who performed a thirty-minute consultative examination, listed the medical records available for her review, and interviewed plaintiff. (Id.) The medical records listed fail to account for much of her medical report, and the ALJ deduced that Dr. Bhattacharya relied on plaintiff's statements. (Tr. 17-18, 377-412.) The ALJ discounted her opinion because of its basis in plaintiff's

subjective complaints, which the ALJ properly discounted as stated above. (Tr. 17-18.) In sum, the ALJ properly discounted Dr. Bhattacharya's opinion.

Plaintiff argues that the ALJ did not engage in the proper analysis before determining that plaintiff failed to follow his prescribed course of treatment. "Impairments that are controllable or amenable to treatment do not support a finding of disability, and failure to follow a prescribed course of remedial treatment without good reason is grounds for denying an application for benefits." Kisling v. Chater, 105 F.3d 1255, 1257 (8th Cir. 1997).

Dr. Burmeister indicated that plaintiff's condition would be suppressed if plaintiff regularly took his medication. (Tr. 441.) Plaintiff did not regularly take medication for his cellulitis before his multiday hospital stays in 2002 and 2006. (Tr. 328, 417.) The medical records from July 26, 2006 and March 21, 2008 indicate that plaintiff regularly took no medication. (Tr. 378, 417.) The ALJ properly found plaintiff not disabled on the basis that he failed to follow a prescribed course of treatment.

The RFC determination reflects that the ALJ considered the record and determined plaintiff's impairments to be limiting despite his finding that plaintiff was not disabled. Accordingly, substantial evidence supported the ALJ's determination of plaintiff's RFC.

## B.  Hypothetical question

Plaintiff also argues that the ALJ erred by relying on the VE's response to a hypothetical question that failed to capture the concrete consequences of plaintiff's impairments. Testimony based on hypothetical questions that do not encompass all relevant impairments cannot constitute substantial evidence to support the ALJ's decision. Hillier v. Social Sec. Admin., 486 F.3d 359, 366 (8th Cir. 2007). Hypothetical questions should set forth impairments supported by substantial evidence on the record and accepted as true and capture the 'concrete consequences' of those impairments. Id.

Particularly, plaintiff challenges the ALJ's reliance on the VE's response to a hypothetical question that omitted the need for thirty-minute periods of leg elevation. However, such need finds support only in plaintiff's testimony and in Dr. Bhattacharya's report, which the ALJ properly discounted as stated above. Therefore, plaintiff's argument is without merit.

## VI. CONCLUSION

For the reasons set forth above, the final decision of the Acting Commissioner of Social Security is affirmed under Sentence 4 of 42 U.S.C. § 405(g).

An appropriate Judgment Order is issued herewith.

.

/S/   David D. Noce
**UNITED STATES MAGISTRATE JUDGE**

Signed on March 19, 2013 .